## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 23-cr-308 (JWB/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Arthur Fields, | |
| Defendant. | |

This matter is before the Court on Defendant Arthur Fields' Motion to Dismiss the Indictment (Dkt. 18); Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 19); and Motion to Suppress Statements, Admissions, and Answers (Dkt. 20). This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.    PROCEDURAL BACKGROUND

On October 4, 2023, Fields was indicted on one count of Felon in Possession of a Firearm. (Dkt. 6.) The Court held a pretrial motions hearing on December 14, 2023. (Dkt. 30.) Mary Riverso and Thomas Calhoun-Lopez, Assistant United States Attorneys, appeared on behalf of the Government. Matthew Deates and Aaron Morrison, Assistant Federal Defenders, appeared on behalf of Fields, who was present at the hearing.

Fields filed supplemental briefing on February 8, 2024 (Dkt. 40), and the Government filed its supplemental briefing on March 7, 2024 (Dkt. 45). The Motions are now ready for decision.

## II.    FACTUAL BACKGROUND

At the December 14, 2023 hearing, Brooklyn Center Police Sergeant Brandon Johnson testified regarding his basis for the July 4, 2023 traffic stop of a car driven by Fields that led to his subsequent arrest and the Indictment in this matter.  Sergeant Johnson has been a police officer for the City of Brooklyn Center since 2015.  (Dkt. 34 (December 14, 2023 Hearing Transcript) at 10:6-14.)[1]

Sergeant Johnson testified that he had been patrolling in a marked squad car on July 4, 2023.[2]  (*Id.* at 15:6-17.)  He testified that he observed a red and white Dodge Magnum ("Dodge") driving northbound on James Circle North in front of a Super 8 Hotel that did not "come to a full and complete cessation" at a stop sign before taking a left turn westbound onto Freeway Boulevard.  (*Id.* at 16:6-12, 50:6-16.)  Sergeant Johnson testified that he observed this traffic violation shortly before 1:10 a.m. and that he was in the area of 65th and Humboldt, approximately two blocks to the east, and traveling westbound when he observed the Dodge make the turn out in front of him onto Freeway Boulevard.  (*Id.* at 16:2-4, 13-24, 50:19-51:9.)  Sergeant Johnson testified that the intersection at issue was well-lit by a streetlamp and that he had an unobstructed view.  (*Id.* at 17:9-22.)  As a result of observing this violation, Sergeant Johnson activated

---

[1]    Unless stated otherwise, any page number citations to the docket entries in this Report and Recommendation refer to the CM/ECF pagination.

[2]    The transcript states "unmarked squad car," but the car was a "blue squad car" with a badge and push bumper (Dkt. 34 at 15:13-17), so the Court describes it as a marked squad car.

his in-car camera system or body worn camera, in an effort to capture the violation.  (*Id.* at 17:23-18:7.)  Activating either one of those cameras activates both.  (*Id.* at 18:5-6.)

After starting the cameras and before pulling the vehicle over, Sergeant Johnson ran the Dodge's license plate through the National Crime Information Center ("NCIC"). (*Id.* at 18:8-14.)  He testified that he does this before any traffic stop, if reasonably able, to see if there are any hits or alerts on the plate, to make sure the plate matches the vehicle, and for general officer safety.  (*Id.* at 18:15-17.)  Sergeant Johnson further testified that a mismatch between the plates and the vehicle "could be a stolen vehicle." (*Id.* at 18:18-20.)  Sergeant Johnson testified that when entering the Dodge's license plate, he incorrectly entered an "M" instead of an "H" for the first letter of the plate, although he did enter the rest of the plate correctly.  (*Id.* at 18:21-19:7; *see also* Gov't Ex. 2 at 00:55-57 (in-car system footage showing entry).)  Sergeant Johnson attributed this to distance, which he testified was usually the main factor for this kind of mistake, and "[o]bviously it's dark out as well when I'm working, so not very common for me but that can happen."  (Dkt. 34 at 19:8-11.)  He testified that he did not often make this kind of mistake.  (*Id.* at 19:12-14.)

Because Sergeant Jones entered the wrong license plate number, the database returned a 2013 silver Nissan as the vehicle rather than the Dodge.  (*Id.* at 19:15-21, 37:8-14; *see also* Gov't Ex. 2 at 01:15-32.)  Sergeant Johnson initiated the traffic stop a few seconds later.  (Dkt. 34 at 37:8-19; Gov't Ex. 2 at 01:29-32.)  Sergeant Johnson notified dispatch that he was pulling over the vehicle because the "plate does not match," which is also reflected in the dispatch Incident Detail Report.  (Dkt. 34 at 38:20-23; Gov't Ex. 2 at

01:32-1:50; Def.'s Ex. 2 at 00000051.) He did not provide dispatch with any other reason for the traffic stop. (Dkt. 34 at 38:24-25; Gov't Ex. 2 at 01:50-54.) On cross-examination, Sergeant Johnson acknowledged that he did not give any other reason for the stop at the time and that it was important to be accurate and up to date when giving dispatch the reason for the stop. (Dkt. 34 at 40:5-10.) On re-direct, he testified that the plate mismatch was not the only reason for the stop, and it was not his practice to narrate all of his actions and thoughts out loud on body worn camera. (*Id.* at 52:3-17.)

Sergeant Johnson stopped the Dodge. (*Id.* at 19:22-23.) He testified that as he was stopping the Dodge, he could see "movement within the cab," and that it appeared as "though the driver was making a quick movement down towards his underneath the seat or feet area." (*Id.* at 20:1-4.) He testified that he observed this movement "[a]s the vehicle was pulling over on to the I-94 east exit after turning off of Shingle Creek Parkway," which is where the stop occurred. (*Id.* at 20:5-9.)

Sergeant Johnson then approached the passenger side of the vehicle and asked Fields for his identification and proof of insurance through the passenger side window, which was fully open. (*Id.* at 20:20-23, 42:13-19; Gov't Ex. 2 at 02:10-19.) Sergeant Johnson testified that he eventually recognized the driver of the Dodge based on a previous interaction with Fields, specifically a DWI-related arrest where narcotics were found. (Dkt. 34 at 20:24-21:4.) He further testified that at the time of the stop, he knew that "years prior . . . officers had an interaction with him," which Sergeant Johnson "believe[d] it was some sort of a robbery-related incident." (*Id.* at 21:10-15.) However, Sergeant Johnson testified that he did not know anything about who was in the Dodge or

recognized the Dodge from "anything prior" before he stopped the Dodge.  (*Id.* at 52:25-53:4.)

Fields immediately provided Sergeant Johnson his identification and looked for his insurance on his phone.  (Dkt. 34 at 21:20-22:2; Gov't Ex. 2 at 03:27-4:04.)  While getting his documents, Field asked what was going on, and Sergeant Johnson told him that he had failed to come to full and complete stop at the stop sign.  (Gov't Ex. 2 at 02:19-35.)  When Sergeant Johnson asked Fields to whom the vehicle belonged to, Fields responded that it was in his name, that "everything's in my name."  (Gov't Ex. 2 at 03:00-10.)

As Fields continued to look for his insurance on his phone, Sergeant Johnson said, "While you look that up, I'm going to check out one more thing here, OK" and began to walk around the back of the car to the driver's door.  (*Id.* at 03:56-4:08.)  Once he reached the driver's door, Sergeant Johnson said, "I'm not going to do anything, I'm just going to open this real quick to check on something, OK?"  (*Id.* at 04:08-11.)  Sergeant Johnson testified that he wanted to clear up the discrepancy between the plate and the vehicle by calling in the vehicle identification number ("VIN") to dispatch.  (Dkt. 34 at 22:2-8, 43:4-19.)  As Sergeant Johnson then opened the driver's door, saying "Just 'cause there's a VIN plate right here.  So the plate don't match the vehicle, man."  (Gov't Ex. 2 at 04:11-16.)  Fields replied "who?" and Sergeant Johnson repeated: "The plate don't match the vehicle."  (*Id.* at 04:16-18.)  Sergeant Jones shone his flashlight on the VIN plate, which was located on the pillar between the driver's door and the rear driver's side passenger door, below the latch, and said "that's all faded, that ain't going to work out for

me.  Give me a second, OK." (*Id.* at 04:18-22.)  Sergeant Johnson testified that the VIN should also be visible on the dashboard in front of the driver, but that he did not look there first because he did not want to step in front of the vehicle or in front of the vehicle's occupants until he had backup, which he did not have at that point in time. (Dkt. 34 at 23:11-24:2.)

Fields continued to say that everything was in his name and he had his information while Sergeant Johnson proceeded to the front of the Dodge to try to read the VIN from the dash.  (Gov't Ex. 2 at 04:21-36; *see also* Dkt. 34 at 24:8-10.)  Fields tried to show Sergeant Johnson his proof of insurance on his phone, and was told to give it to another police officer (who had just arrived) while Sergeant Johnson checked "a couple things." (Gov't Ex. 2 at 04:36-40.)

The officer who had just arrived was Officer Nathan Walton, a police officer with Brooklyn Center.  (Dkt. 34 at 24:25-25:4, 55:23-24.)  Officer Walton testified at the hearing that he responded to Sergeant Johnson's call after hearing it on the radio.  (*Id.* at 58:12-15.)  He testified that he heard Sergeant Johnson initiate a traffic stop based on "plates didn't match the car or something to that effect" and responded because Brooklyn Center "is notorious for people stealing cars" and law enforcement would "recover stolens [sic] or people place plates on vehicles that don't belong."  (Dkt. 34 at 58:18-25.) He responded to the call to ensure Sergeant Johnson's safety, because he knew Sergeant Johnson was alone.  (*Id.* at 58:25-59:2.)  When Officer Walton responded to the call, he understood the reason for the stop to be the mismatched plate, not that Fields failed to

stop at a stop sign. (*Id.* at 67:16-23.) He was not told that Fields was making suspicious movements inside the vehicle. (*Id.* at 67:24-68:1.)

Officer Walton testified that he asked Fields to step out of the vehicle when he arrived on scene because he was concerned about Fields fleeing given the possibility that the vehicle was stolen. (*Id.* at 60:12-21; *see also* Gov't Ex. 3 at 02:43-55.) Fields attempted to hand him paperwork through the open driver's door window, while repeating that everything was in his name and he had everything he needed for the car. (Gov't Ex. 3 at 02:45-53.) Officer Walton responded by asking Fields to step out of the car, and when Fields asked why, given that he had his insurance, Officer Walton responded that he was not worried about Fields' insurance and that they were trying to make sure the Dodge was "not stolen or none of that fancy stuff." (Dkt. 34 at 70:17-22; Gov't Ex. 3 at 02:55-3:13.) When asked on direct examination whether "at this time, do you recall whether you observed any odors coming from the vehicle," Officer Walton responded "At this time, no." (Dkt. 34 at 60:22-24.) The following exchange then took place:

Q. No, you didn't --

A. No, ma'am, I didn't.

Q. -- or you don't recall?

A. I don't recall.

Q. Is it possible that you did?

A. Yes.

(*Id.* at 60:25-61:5.)

However, Sergeant Johnson testified that he observed the following when Fields exited the vehicle:

> A. As Mr. Fields began to step out from the vehicle, there was two observations.  I smelled a faint odor of what I would describe as raw marijuana.  And, additionally, as I was in a position near the front hinge of the door looking into the vehicle, I could see kind of a bulge near the floor mat that his root [sic] foot had hit.

(*Id.* at 26:1-6.)

He further testified that he had not observed an order of marijuana before that time, and he believed that he smelled marijuana for the first time when Fields was exiting because: "There was no real wind or breeze on that evening, and I wasn't sticking my head into the car.  I was kind of observing from the outside.  So once Mr. Fields came out of the vehicle, whatever odor or stagnant air inside the vehicle had come out with him." (*Id.* at 26:11-17.)  Sergeant Johnson testified that he had encountered marijuana thousands of times as a law enforcement officer and he could recognize the odor of marijuana and distinguish between raw and burnt marijuana based on his training and experience.  (*Id.* at 32:9-33:3.)

When Fields exited the Dodge, Officer Walton was standing by the pillar between the driver's door and the passenger door, where the driver's door opened, and Sergeant Johnson was standing near the driver's door hinge, where he had been trying to read the VIN on the dash.  (Gov't Ex. 3 at 02:50-03:05; *see also* Dkt. 34 at 26:1-6.)  Based on the body worn camera footage, neither Officer Walton nor Sergeant Johnson mentioned the smell of marijuana at any point during the stop, nor did any officer mention a bulge underneath the floor mat or that Fields had brushed his foot over a bulge when exiting the

Dodge.  (*See generally* Gov't Ex. 2; Gov't Ex. 3.)  On cross-examination, Sergeant

Johnson testified that neither he nor any other officer mentioned smelling marijuana

before searching the vehicle, and that the first time he reported smelling marijuana was in

his police report.  (Dkt. 34 at 47:14-25.)  He also testified that he did not mention any

observation of the bulge under the floor mat or Fields brushing it with his foot any time

during the stop and that his first mention of the bulge was in his police report.  (*Id.* at

49:12-50:5.)

      Sergeant Johnson testified that the first thing he was concerned with after Fields

exited the vehicle was dispatch's inability to provide him with a read-back on the VIN.

(*Id.* at 27:13-17.)  His body worn camera shows him returning to the VIN plate on the

dash as Fields exited the Dodge, and Sergeant Johnson reciting the VIN to dispatch.

(Gov't Ex. 2 at 05:03-22.)  As he waited for dispatch to respond, Sergeant Johnson stood

by the driver's door (which was still open) and shone his flashlight in the Dodge while

telling another law enforcement officer that he knew Fields well and the last time he took

Fields "down to county," Fields had crack cocaine in his ear.  (*Id.* at 05:22-30.)  At this

point, dispatch asked Sergeant Johnson to repeat the VIN, and he returned to the dash and

repeated the VIN.  (*Id.* at 05:41-06:05.)  Sergeant Johnson then decided to look at the

VIN on the door pillar again, noted that there was no "VIN mark," which "seem[ed]

weird," and then moved papers on the dash to see if the other officer could read the VIN

on the dash better.  (*Id.* at 06:06-36.)  Sergeant Johnson then stood between the open

driver's door and the Dodge for about another 10 seconds while shining his light inside

the car, asking about the VIN, before reaching down and moving the floor mat and

reporting: "He's got a loaded gun. Hook him." (*Id.* at 06:36-52.) When testifying as to this sequence of events, Sergeant Johnson said that once he had another officer assisting with the VIN, he could then change his attention to the bulge under the floor mat, and he went to check that location. (*Id.* at 27:24-28:4.) At that point, he found a revolver under the floor mat. (Dkt. 34 at 28:5-6.)

Fields was then placed under arrest and handcuffed. (*Id.* at 28:19-25, 46:2-8; Gov't Ex. 3 at 04:57-55.) Sergeant Johnson asked if Fields had a permit to carry and he replied that he did not. (Gov't Ex. 2 at 7:04-11; Gov't Ex. 3 at 05:00-16.) Sergeant Johnson asked if Fields remembered him from "the Super 8 deal a long time ago" or the other time he picked Fields up (Fields did not), told other officers on scene that he knew Fields "extremely well," that the Dodge "was probably stolen," and that there was a gun "underneath there that he hid." (Gov't Ex. 2 at 07:16-32.) Dispatch then asked for more information regarding the VIN, and Sergeant Johnson stated he would read the VIN better now that he had a better view. (*Id.* at 07:32-56.) Officer Walton, who had begun searching the driver's area, asked about the firearm, and Sergeant Johnson responded, "I don't have it out yet, it's underneath the, um, the matting right there," at which time Officer Walton reported "we got weed, he's selling," another officer reported they had found crack on Fields, and Sergeant Johnson said, "OK, that makes sense, last time I brought him to county, he had crack in his ear." (*Id.* at 07:55-8:10; *see* Dkt. 34 at 64:1-24 (Officer Walton testifying as to discovery of marijuana).)

Officer Walton testified to the following after Sergeant Johnson had found the gun and after Fields was in custody:

A. I returned to Mr. Fields' car or I assisted with getting Mr. Fields lodged in the squad and then I went to Mr. Fields' car, sorry.

Q. And when you approached Mr. Fields' vehicle this time, what did you observe?

A. I smelled the odor of marijuana from the vehicle. There was shake underneath the driver floor board, the driver's seat. Underneath the driver's seat, a shake, I mean marijuana residue, the leaves underneath the driver seat.

Q. Did you proceed then to search the vehicle?

A. Yes.

Q. Where did you search first?

A. I searched the center console.

Q. Why?

A. There was a plastic bag hanging out so when I opened up the center console, I grabbed the plastic bag and observed marijuana.

Q. You said you found marijuana in the center console?

A. Yes, ma'am.

(Dkt. 34 at 64:6-24; *see also* Gov't Ex. 3 at 5:27-6:13 (showing what appears to be marijuana residue under the driver's seat and discovery of marijuana in center console).)

Sergeant Johnson testified that about 47 grams of marijuana was found in the center console, which field-tested positive as marijuana, and that it was packaged in plastic baggies (not "hermetically sealed") and a "Tupperware" container. (Dkt. 34 at 29:4-25.) He further testified that the marijuana was not in original dispensary packaging, but instead "in loose plastic bags in a Tupperware container and on the floor boards," and therefore a violation. (*Id.* at 30:1-8.) Officer Walton testified that the marijuana was in small plastic baggies inside a sealed "Tupperware" container, with a

few loose small plastic baggies of marijuana, all inside a larger plastic bag.  (*Id.* at 65:9-23; *see also* Gov't Ex. 6.)  He similarly testified that it was a violation for Fields to possess marijuana in this manner because the marijuana was not in the original packaging from a dispensary.  (Dkt. 34 at 65:24-66:3.)

On cross examination, counsel asked Officer Walton, "you testified that you believed Mr. Fields' car smelled like marijuana immediately before you found the marijuana, right?"  (*Id.* at 74:9-11.)  Officer Walton responded, "So prior to my search, yes."  (*Id.* at 74:12.)  When asked when he was first reported smelling the marijuana, Officer Walton testified: "Yes, it would have been after I told my partners, hey, or hold on, you're going to trip me up.  So I smelled the weed before I searched his car.  When I found the weed, it just confirmed what I smelled, and I had informed my partners, or I informed Sergeant Johnson.  I know I informed somebody."  (*Id.* at 75:10-15.)  Counsel clarified that he was asking about when Officer Johnson first reported to anyone that he smelled marijuana (not when he first smelled it), and Officer Walton said: "It would be after I found it, yes."  (*Id.* at 75:16-20.)  Officer Walton's body worn camera audio was muted at this time, but Sergeant's Johnson's audio was on and there was no mention by Officer Walton of the smell of marijuana coming from the vehicle, only his assertion after finding the marijuana "that we've got weed, he's selling."  (Gov't Ex. 2 at 07:55-8:06.)

Sergeant Johnson continued trying to ascertain ownership of the Dodge by looking for a title or other bill of sale in the glove compartment given that the VIN was hard to read, and finally located a printout of the title with a VIN.  (Gov't Ex. 2 at 13:12-14:19.)

After reading the VIN from the title to dispatch, while checking the VIN on the title against the VIN on the dash, Sergeant Johnson realized that he had been reading a "G" in the VIN as a "6" to dispatch. (*Id.* at 14:20-15:06.) Officer Walton reminded Sergeant Johnson that he was "not muted" and Sergeant Johnson muted his microphone for the remainder of the video recording.[3] (Gov't Ex. 2 at 15:17-20:56.)

Fields was taken to the Hennepin County Adult Detention Center and his vehicle towed. (Dkt. 34 at 31:5-16.) Officer Gul's body worn camera video shows him entering information from Fields' driver's license into his squad computer and reviewing the results. (Gov't Ex. 4 at 13:30-14:30.) Officer Gul advised Fields of his *Miranda* rights at the scene of his arrest on July 4, 2023, while in the squad, and Fields stated that he did not wish to speak to the law enforcement officer. (Dkt. 34 at 82:24-83:5; Gov't Ex. 4 at 14:37-15:16.) Officer Gul then reviewed more information on his squad computer, left his squad, and informed Sergeant Johnson that the Dodge was registered to Fields, at which point the officers muted their audio. (Gov't Ex. 4 at 15:17-15:51.) A few minutes later, Sergeant Johnson told Fields that his vehicle was plated to the wrong vehicle, to which Fields objected. (*Id.* at 19:00-30.) Sergeant Johnson later returned to Fields and "took back what [he] said," explaining that when he ran the plate, it came back as a Nissan, but when he ran it again "through the clerk," the plate came back as his Dodge in

---

[3]    Officer Walton also muted his microphone during portions of time after Fields was taken into custody. (Gov't Ex. 3 at 05:39-14:30, 24:24-27:59.) Sergeant Johnson testified that it was department policy to mute when not having interactions with a suspect. (Dkt. 34 at 30:9-21.)

his name and not the Nissan. (*Id.* at 19:30-20:30.) He then told Fields not to worry about the plate, as it was "the least of [Fields'] worries at this point." (*Id.* at 20:25-29.)

Police Detective Brett Vesey, with the City of Brooklyn Center Police Department, testified at the hearing that he encountered Fields on July 5, 2023, but had recognized him from a prior aggravated robbery case in 2017. (Dkt. 34 at 76:23-77:13, 79:14-22.) As part of his investigation, Detective Vesey read Sergeant Johnson's report, and on July 6, 2023, collected the surveillance video from the Super 8 next to the stop sign at issue, and reviewed the video, which showed the Dodge at the stop sign outside the Super 8 and Sergeant Johnson following approximately 20 seconds later.[4] (*Id.* at 79:23-80:25, 92:15-93:15.)

Detective Vesey testified that he knew from the police reports that Fields had been advised of and had invoked his *Miranda* rights on July 4, 2023. (Dkt. 34 at 92:1-8.) Detective Vesey acknowledged that Fields had told law enforcement on July 4, 2023 that he did not want to speak without a lawyer. (*Id.* at 92:9-14.)

On the evening of July 5, 2023, Detective Vesey went to meet with Fields to execute a search warrant for his DNA in order to compare it to any DNA located on the firearm and narcotics seized from the scene of his arrest. (*Id.* at 84:1-22.) Detective Vesey met with Fields alone in at a Hennepin County Jail interview room to execute the

---

[4]    Based on the Court's review, the Super 8 surveillance video shows the Dodge making a left turn next to the Super 8 without making a complete stop and what appears to be Sergeant Johnson's squad pass that intersection approximately 20 seconds later. (Gov't Ex. 1 at 00:57-1:24.) The footage from Sergeant Johnson's squad car appears to show a vehicle in the distance turning left into his path as he drove westbound on Freeway Boulevard. (Def.'s Ex. 1 at 00:01-14.)

warrant.  (*Id.* at 84:21-22, 91:8-16.)  Detective Vesey wore his badge but did not have his

service revolver on his person.  (*Id.* at 91:17-21.)

Detective Vesey testified that he activated his body camera before Fields entered

the interview room to document his interaction with Fields.  (*Id.* at 85:6-12.)  Fields

walked into the room, and Detective Vesey introduced himself as a police detective, and

gave him his business card.  (*Id.* at 86:1-6; Gov't Ex. 5 at 00:40-46.)  As Detective Vesey

shut the door and returned to his seat, Fields began telling him about how he was upset

that the officers collected some of his property, including his keys and wallet.  (Dkt. 34 at

86:4-6; Gov't Ex. 5 at 00:46-01:02.)  Detective Vesey told Fields to give him a call once

he was out of jail to retrieve the items.  (Dkt. 34 at 86:7-13; Gov't Ex. 5 at 01:02-01:12.)

Fields then immediately started talking about the case, including stating that everything

in the vehicle was his.  (Dkt. 34 at 86:18-87:15; Gov't Ex. 5 at 01:12-03:33.)  Detective

Vesey testified that he did not ask him anything about the case, did not initiate the

conversation, did not prompt him to talk about the case, and merely listened for about

two minutes.  (Dkt. 34 at 87:15-24.)  Based on Detective Vesey's body worn camera

footage, he did not say anything to Fields while Fields was speaking.  (Gov't Ex. 5 at

01:12-03:33.)  Once Fields finished speaking, Detective Vesey asked Fields if he

remembered his *Miranda* rights, and asked if he wanted them read to him again.  (Dkt. 34

at 88:1-9; Gov't Ex. 5 at 03:31-39).  Fields responded at first "I don't remember" because

he was upset, then stated, "no, I remember," but Detective Vesey read him his *Miranda*

rights again.  (Gov't Ex. 5 at 03:31-3:58.)  Detective Vesey eventually took a swab of

Fields' DNA.  (Dkt. 34 at 88:10-12.)  Detective Vesey reminded Fields that he previously

stated he did not wish to speak to police, and Fields stated that he still needed a lawyer. (Gov't Ex. 5 at 04:00-10.)  Detective Vesey testified that at no point did he ask Fields about the case, threaten him, use any violence, or deceive him, but rather that he explained who he was and what his role was in the case.  (Dkt. 34 at 88:15-89:4.)  Fields did not request any breaks and he seemed mature and intelligent consistent with his age. (*Id.* at 89:5-15.)  Detective Vesey testified he did not pause the recording until after Fields returned to his holding cell.  (*Id.* at 89:16-90:1.)

### III.    MOTION TO SUPPRESS EVIDENCE

In his motion to suppress evidence, Fields seeks suppression of the fruit of the traffic stop, including evidence of the charged firearm and his statements to law enforcement.  (Dkt. 40 at 6.)  Fields argues that Sergeant Johnson stopped his car without reasonable suspicion of a traffic infraction or any other offense and that the subsequent search of his vehicle was without reasonable suspicion or probable cause.  (*Id.*)  The Court considers these arguments in turn.

### A.    Validity of the July 4, 2023 Traffic Stop

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons . . . that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 9

(1968)), *overruled in part on other grounds by Davis v. Washington*, 547 U.S. 813 (2006).

"A traffic stop is a seizure, so it must be supported by reasonable suspicion or probable cause." *United States v. Maurstad*, 35 F.4th 1139, 1143 (8th Cir. 2022) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)). Indeed, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted); *see also United States v. Dortch*, 868 F.3d 674, 678 (8th Cir. 2017) (finding that an officer may conduct an investigative stop and brief detention when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot") (marks and citations omitted). "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. A traffic violation, no matter how minor, will provide probable cause or at least a reasonable, articulable basis to justify a traffic stop. *See United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008); *see also United States v. Williams*, 39 F.4th 1034, 1041 (8th Cir. 2022) ("Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." (marks and citation omitted)).

"While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012) (internal

quotation marks omitted). "Reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017) (marks and citation omitted). "[O]fficers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Hurd*, 785 F.3d 311, 314 (8th Cir. 2015) (marks and citation omitted). In addition, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also Hurd*, 785 F.3d at 314-15. In deciding whether the requisite degree of suspicion exists, a court views an officer's observations as a whole, rather than as discrete and disconnected occurrences. *See Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019) (citation omitted).

To determine if probable cause or reasonable suspicion existed, we look at what the officers "reasonably knew at the time," rather than looking back with the benefit of hindsight. *See United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) (citation omitted). Both the Eighth Circuit and United States Supreme Court have concluded that an officer who observes a minor traffic violation can stop the vehicle even if the stop is a pretext for another investigation. *See, e.g.*, *United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that an officer's subjective intentions for conducting a traffic stop "play no role in ordinary, probable-cause Fourth Amendment analysis"); *United States v. McLemore*, 887 F.3d 861,

18

864 (8th Cir. 2018) ("[I]f an officer has reasonable suspicion or probable cause to stop for a traffic violation, any ulterior motivation on the officer's part is irrelevant." (marks and citations omitted)); *United States v. Linkous,* 285 F.3d 716, 719 (8th Cir. 2002) ("We have previously observed that it is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle. This is true even if a valid traffic stop is a pretext for other investigation." (marks and citation omitted) (cleaned up)).

### 1.    Stop Sign Violation[5]

Fields argues that Sergeant Johnson was not in a position to observe whether he came to a complete stop at the stop sign near the Super 8 hotel.  (Dkt. 40 at 8.)  Fields relies in part on the footage from Sergeant Johnson's in-squad camera, which he maintains shows no violation.  (*Id.*)  The Government also relies on the footage from the in-squad camera.  (Dkt. 45 at 3.)  The problem with the in-squad camera footage is that its quality is imperfect and, the Court recognizes, may not reflect all that Sergeant Johnson saw given the difference in the camera's location and Sergeant Johnson's location and the difference in the video resolution compared to what the naked eye could observe at the time.  The Court can faintly discern a vehicle turning left by the Super 8 from this footage.  (Def.'s Ex. 1 at 00:01-14.)  Further, Detective Vesey testified that he

---

[5]    The parties do not dispute that a failure to stop at a stop sign is a violation of Minnesota law and can justify a traffic stop for Fourth Amendment purposes. *See United States v. Galtney*, No. 19-cr-332 (MJD/BRT), 2022 WL 16701377, at *2-5 (D. Minn. Aug. 29, 2022*), R. & R. adopted*, 2022 WL 16549469 (D. Minn. Oct. 31, 2022).

was familiar with the area where the stop sign was located, that it was well lit, and there were no obstructions to visibility in the road in that area.  (Dkt. 34 at 82:13-23.)

In addition, Sergeant Johnson's testimony that he witnessed a traffic violation at the stop sign is supported by the fact that he activated his squad and body worn camera recordings in time to capture the violation, as the recordings have a 30-second playback feature and the Super 8 footage shows Sergeant Johnson passing the stop sign within 30 seconds after Fields made the left turn.  (Dkt. 34 at 50:22-51:9, 82:4-12; Def's Ex. 1 at 00:00-30 (showing Sergeant Johnson passing the Super 8 approximately 25 seconds into the recording); Gov't Ex. 1 at 01:00-30 (showing Fields making the left turn and Sergeant Johnson's squad passing the stop sign about 25 seconds later).)  Fields argues that Sergeant Johnson's failure to activate his squad lights at the time of the alleged traffic violation means that he did not stop Fields based on that violation.  (Dkt. 40 at 9.)  But this fails to address Sergeant Johnson's activation of his cameras at a time that corresponds with the failure to stop and testimony that he ran the Dodge's license plate before pulling the vehicle over to see if there were any hits or alerts, to see if the plate matched the vehicle, and for general officer safety.  (Dkt. 34 at 18:8-20.)

Fields also argues that Sergeant Johnson's failure to tell dispatch that he was stopping the car due to the stop sign violation shows the plate mismatch was the only reason for the stop.  (Dkt. 40 at 10.)  However, Fields identifies no caselaw supporting the proposition that an officer must provide all reasons for a stop to dispatch.  Further, Sergeant Johnson first told Fields that the reason for the traffic stop was that he ran the stop sign.  (Gov't Ex. 2 at 02:23-35.)  Finally, while the Super 8 surveillance video is not

direct evidence that Sergeant Johnson observed Fields make a traffic violation, it does show that the area is well lit, corroborating Sergeant Johnson's testimony that he could see the stop sign violation.

Based on the evidence, including the video footage and testimony, the Court finds that Sergeant Johnson had at least a reasonable suspicion that Fields had violated Minnesota law by not making a full stop at a stop sign when he initiated the traffic stop. Therefore, the Court finds that the initial stop did not violate the Fourth Amendment.

**2.      Stop Based on a "Mismatched" License Plate**

Fields next argues that the stop of the Dodge for a "mismatched" plate violated the Fourth Amendment because "it was not objectively reasonable for Sgt. Johnson to 'mistakenly' conclude the Magnum's plates were mismatched because he had ample opportunity to read and input the correct license plate number prior to the traffic stop." (Dkt. 40 at 12.)  Fields argues that Sergeant Johnson had ample opportunity to correctly read and enter the license plate after the initial "mismatch," including when following the Dodge, after the stop but before Sergeant Johnson exited his squad car, and when passing the license plate on his way to speak to Fields.  (*Id.* at 13-16.)

The Government counters that Sergeant Johnson's mistake regarding the license plate was reasonable, as "he was driving, trying to read, and typing in the license plate information all at the same time."  (Dkt. 14 at 12.)  The Government argues that "[i] n the dark during his night shift, he misread one letter of Fields's license plate—he mistook an H for an M" and that those two letters are "similarly shaped."  (*Id.* at 12-13.)  The Government further argues:

Sgt. Johnson had no reason to believe that he misread the license plate. He does not normally make mistakes like that. Brooklyn Center has become notorious for stolen vehicles, so the fact that the license plates and vehicles did not match was not surprising to him. There was no reason for him to delay taking action and spend time checking the license plates again and again. Instead, he had to focus on next steps like effecting a traffic stop safely. And certainly, by the time he exited his vehicle, there was no reason for him to return to his vehicle and run the check again. Instead, the easiest way to proceed was to radio the VIN number to dispatch, who could run a vehicle check more efficiently.

(*Id.* at 13 (citations omitted).)

As stated above, an officer must have "a reasonable basis for believing that the driver has breached a traffic law." *United States v. Gordon,* 741 F.3d 872, 876 (8th Cir. 2013). "[I]t is well established that mistakes of law or fact, if objectively reasonable, may still justify a valid stop." *United States v. Rutledge*, 61 F.4th 597, 602 (8th Cir. 2023) (quoting *United States v. James*, 52 F.4th 1035, 1038 (8th Cir. 2022)). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014)). "Subjective intent is not determinative in deciding whether the stop was reasonable." *United States v. Mallari*, 334 F.3d 765, 767 (8th Cir. 2003). In addition, the credibility of Sergeant Johnson does not factor into the Court's analysis. *See United States v. Forjan*, 66 F.4th 739, 747 (8th Cir. 2023) ("The district court noted that its decision that Deputy Hook's mistake was reasonable was based on Deputy Hook's credibility. But the Fourth Amendment tolerates only reasonable mistakes, and those mistakes—whether of fact or of law—must

be objectively reasonable.  We do not examine the subjective understanding of the

particular officer involved." (cleaned up)).

Fields relies on *Garcia v. City of New Hope*, 984 F.3d 655, 665-66 (8th Cir. 2021),

to support his unreasonableness argument.  (Dkt. 40 at 16.)  In *Garcia*, a civil rights

action under 42 U.S.C. § 1983, the officer asserted that she initiated a traffic stop in part

because she believed the license plate had a plastic cover over the entire plate and a red

plate frame that obstructed the view of the month and year stickers in violation of state

law.  984 F.3d at 662, 665.  The officer also argued that if Garcia's license plate was not

covered, she was still entitled to qualified immunity because her belief that the license

plate was covered was objectively reasonable.  *Id.* at 664.  For the purposes of qualified

immunity on summary judgment, the Eighth Circuit found:

> It is true that we have found that an officer made a reasonable mistake about
> a license plate violation where the license plate was not centered on the front
> bumper and "it was dark outside, making it difficult for [the officer] to fully
> scan the vehicle for a front license plate." *United States v. Payne*, 534 F.3d
> 948, 951 (8th Cir. 2008). But the blurry video does not show that Officer
> Baker's view of the license plate was hindered. In fact, the video depicts a
> clear day and shows that Officer Baker—who was right behind Garcia's
> car—had a clear view of the license plate. Officer Jacobs's testimony and the
> blurry video are not enough to show that Officer Baker had an objectively
> reasonable belief—based on the totality of the circumstances—that the
> license plate was unlawfully covered.

*Id.* at 665-66 (alteration in original).

The Government counters that *Garcia* is distinguishable because the video at issue

in that case depicted a clear day, while Sergeant Johnson was working in the middle of

the night and trying to read the license plate in the dark with bright headlights, stop lights,

and reflective signs interfering with his ability to read the plate.  (Dkt. 45 at 13-14.)

The Court finds *Garcia* distinguishable from the facts of the instant case. *Garcia* found that it was not objectively reasonable for the officer to believe the license plate was covered and a red frame covered the month and year stickers given a video that showed she had a clear, daytime view of the plate. 984 F.3d at 665-66. Here, the video shows that Sergeant Johnson was reading and typing in a license plate number in the dark and while driving in pursuit of the Dodge.

The Government relies on *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012), for the proposition that mistakes about a license plate violation were reasonable under present circumstances. (Dkt. 45 at 14.) *Hollins* dealt with a situation where the officers initially observed and stopped a SUV because it did not bear license plates. *Id.* at 706. This was a violation of Nebraska law unless the SUV bore a valid "In Transit sticker," which could replace a license plate for 30 days after a vehicle's purchase. *Id.* When approaching the vehicle, an officer saw what appeared to be a valid "In Transit" sticker, although he did not then verify its expiration date. *Id.* at 706. Hollins argued that once the officer saw the sticker, the reasonable suspicion for the stop vanished, and the officer could not continue to detain the SUV's occupants. *Id.* at 706.

The Eighth Circuit disagreed, explaining "Although the officers were mistaken about the SUV's registration status, their actions were objectively reasonable because they could not then see the In Transit sticker. The officers had a reasonable suspicion for a traffic stop." *Hollins*, 685 F.3d at 706. The Eighth Circuit continued:

> Only after shining his spotlight, exiting his car, and approaching the SUV did he see the In Transit sticker. Even then, it was not immediately verifiable as a valid sticker. The officer did not see its expiration date, and his experience

24

taught him that even facially valid stickers are not *legally* valid (since illegally sold and distributed In Transit stickers are relatively common). He then conducted a reasonable investigation by requesting the driver's license, insurance card, and registration. The initial traffic stop and the officer's limited inquiry—which led to the search and Hollins' arrest—were constitutionally valid.

*Id.* at 707.

Fields argues that "*Hollins* is readily distinguishable because the officers had observed no license plates prior to the traffic stop and, crucially, did not see the 'In Transit' sticker until *after* they had already stopped the SUV." (Dkt. 40 at 17-18.) This ignores the fact that the mistake at issue here—Sergeant Johnson's typing error— occurred before the stop, similar to law enforcement's failure to see the "In Transit sticker" before stopping the vehicle in *Hollins*.

The Court recognizes Fields' argument that, unlike the law enforcement officers in *Hollins*, Sergeant Johnson had ample opportunity to check his work before stopping the Dodge, after stopping the Dodge, and in general any time before he opened the driver's door to look for the VIN. (Dkt. 40 at 17-18.) In other words, Fields argues that a reasonable officer would have realized under those circumstances that he could have made a mistake when entering the plate number and should have checked his work by entering the plate number again.

The Eighth Circuit has not imposed an automatic requirement that an officer check their work to support a finding that a mistake was reasonable. For example, in *United States v. Payne*, 534 F.3d 948 (8th Cir. 2008), the Eighth Circuit concluded that an officer's mistaken belief that a vehicle did not have a front license plate was reasonable

25

because the "vehicle's front license plate was not centered on the vehicle's front bumper in the usual manner and it was dark outside, making it difficult for [the officer] to fully scan the vehicle for a front license plate." *Id.* at 951.  The Eighth Circuit reached a similar conclusion in *United States v. Flores-Sandoval*, 366 F.3d 961 (8th Cir. 2004).  In that case, the officer "relied on a regular practice of observing oncoming traffic-via his rear view mirror-and observing the light that bounced off of the reflective surface on the front license plate of the approaching vehicle." *Id.* at 963.  The officer concluded that the vehicle at issue had no license plate because he did not see a reflection from the front of the vehicle and he saw an empty plate bracket, but "[i]t was later determined that the vehicle did in fact have a front license plate that was partially obscured from view because it had been mounted below the standard plate bracket." *Id.* at 962-63.  According to the Eighth Circuit, "[t]hese perceptions, although flawed, were sufficiently reasonable to provide probable cause to stop the vehicle in which Flores-Sandoval was traveling." *Id.* at 963.

In *United States v. Williams*, 929 F.3d 539 (8th Cir. 2019), the Eighth Circuit dealt with a fact pattern more like Sergeant Johnson's typing error.  The *Williams* defendant argued that the district court erred in denying his motion to suppress because the officer made an objectively unreasonable mistake in identifying his red Challenger as stolen. *Id.* at 543.  The officer was investigating reports of stolen cars in a high crime area and had with him department "hot sheets," listing the vehicles reported stolen in the Kansas City metropolitan area with each car's make, model, color, and year, utilizing abbreviations to refer to the specific car model. *Id.* at 542.  Officers were monitoring a purple Dodge

Challenger listed on the hot sheets when the officer also advised that a red Dodge Challenger had also been stolen from the same dealership as the purple Challenger, which was inaccurate; the second stolen vehicle was a red Dodge Charger, not a red Dodge Challenger. *Id.* The officer later testified that he misread the "hot sheet" when he had checked it that morning and believed that the stolen vehicle was a red Challenger. *Id.* The officer ultimately initiated surveillance on and stopped the subject red Dodge Challenger. *Id.* The Eighth Circuit found the officer's mistake reasonable under those circumstances:

> We conclude that Officer Palmer's mistaken belief that the red Challenger was stolen based upon his misreading of the "hot sheets" was objectively reasonable. Although Officer Palmer **admitted he did not double check** the "hot sheets" to verify that the red Challenger was listed as stolen, the facts, when considered from "what [Officer Palmer] reasonably knew at the time," *see id.*, show the reasonableness of his mistake: a Dodge Charger and Dodge Challenger have similar names and share similar abbreviations on the "hot sheets"; the red Challenger was observed stopping briefly next to the purple Challenger, which had been verified as stolen; Officer Palmer learned the purple Challenger had been stolen from a car dealership, increasing the likelihood that another car of the same make and model could also have been stolen; both vehicles were spotted in a high-crime area where Officer Palmer had previously located or recovered stolen vehicles; and the red Challenger was in transit, not stationary like the purple Challenger, which provided less of an opportunity to verify the information on the "hot sheet" before starting to pursue it and conduct surveillance. The district court thus did not err in concluding that Officer Palmer's mistake was objectively reasonable and provided sufficient reasonable suspicion to perform an investigatory stop.

*Id.* at 544 (emphasis added).

Here, the Court concludes that Sergeant Johnson's mistake in typing was objectively reasonable under the circumstances. The mistake occurred around 1:00 a.m., and he was reading the plate in the dark while following the Dodge. As to Sergeant

Johnson's obligation to check his work, there is evidence that stolen vehicles and altered plates were a known problem in Brooklyn Center (Dkt. 34 at 58:23-25), and he testified that a plate mismatch could be due to altered plates or a stolen vehicle (*id.* at 18:18-20). Sergeant Johnson testified that he did not often make these kinds of mistakes. (*Id.* at 19:12-14.) Further, Sergeant Johnson relied on an NCIC report that the plate he entered matched to a Nissan instead of a Dodge, and there is no indication that the NCIC database was unreliable. *Cf. Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1045-46 (9th Cir. 2014) (denying qualified immunity for traffic stop where officer did not independently verify a license-plate reader known to make frequent mistakes). When determining whether probable cause or reasonable suspicion existed, a court considers what the officer "reasonably knew at the time," rather than looking back with the benefit of hindsight. *Hollins*, 685 F.3d at 706 (citation omitted). Here, in view of the circumstances, the Court finds that Sergeant Johnson's mistake in entering the license plate number and failure to check his work were objectively reasonable under the circumstances and Sergeant Johnson had sufficient reasonable suspicion to perform an investigatory stop based on the plate "mismatch."

**B.    Search of the Dodge**

Fields also argues that even if the stop was constitutionally permissible, the subsequent warrantless search of his vehicle violated the Fourth Amendment. (Dkt. 40 at 19.) The Government asserts that there was probable cause to search the vehicle because Sergeant Johnson observed the faint odor of raw marijuana when Fields exited the vehicle. (*Id.* at 16.) The Government also relies on Officer Walton's observation of

marijuana residue in plain view of the driver's side door and smelling the odor of marijuana constituted probable cause, although it is unclear whether the Government relies on this as an independent basis for Sergeant Johnson's search or to corroborate Sergeant Johnson's testimony that he smelled marijuana when Fields exited the Dodge. (*See id.* at 17.)

The Eighth Circuit has repeatedly held that the smell of marijuana coming from a vehicle supports probable cause for a warrantless search inside the vehicle. *See, e.g.*, *United States v. Walker*, 840 F.3d 477, 483-84 (8th Cir. 2016) (rejecting the assertion that an officer had improperly extended the traffic stop and concluding that a smell of marijuana after the defendant opened window provided probable cause to search the car); *United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015) (concluding that the "slight odor of marijuana" was "sufficient to establish probable cause to search an automobile and its contents"); *United States v. Beard*, 708 F.3d 1062, 1065 (8th Cir. 2013) ("The smell of marijuana in a vehicle can establish probable cause to search the vehicle for drugs.") (citation omitted); *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000) (concluding that the smell of "raw marijuana" created "probable cause to search the car and its contents for drugs") (citation omitted); *United States v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000) ("[T]he smell of marijuana gave the deputy probable cause to search Peltier's truck for drugs.") (string citation omitted); *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (concluding that the odor of burnt marijuana on the suspect and the smell of air freshener in the car gave the officer probable cause to search the vehicle). For purposes of this Motion, the law is clear that "the smell of marijuana, along with the

credible testimony by the officer, is sufficient to establish probable cause to search an automobile and its contents."[6] *United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015).

Sergeant Johnson testified that he smelled a faint odor of raw marijuana when Fields exited the Dodge at Officer Walton's direction.  (Dkt. 34 at 26:1-6.)  Fields questions the credibility of this testimony because Sergeant Johnson did not mention smelling marijuana before he found the firearm, before Officer Walton found the marijuana in the center console, or any time before he issued his police report.  (Dkt. 40 at 20-21.)  Fields further notes that no other officer on the scene mentioned smelling marijuana before the search that revealed the firearm.  (*Id.* at 21.)

However, Officer Walton testified that, while he could not remember if he smelled marijuana when Fields exited the Dodge, he did smell raw marijuana when he returned to the car after Fields was taken into custody.  (Dkt. 34 at 60:22-61:24.)  The Court recognizes that Officer Walton's smelling marijuana after Sergeant Johnson's search that revealed the firearm does not provide probable cause for Sergeant Johnson's search.  But it does corroborate that an odor of marijuana was emanating from the Dodge.  *See United States v. Thomas*, No. 4:22-CR-40046-1, 2023 WL 7390476, at *9 (D.S.D. Aug. 29, 2023) (finding credible a police officer's testimony that he smelled raw marijuana when first approaching the driver's side window despite the officer's failure to mention the

---

[6]    The Court notes marijuana possession had not yet become lawful in Minnesota as of the date of the July 4, 2023 stop and that the decision in *State v. Torgerson*, 995 N.W.2d 164 (Minn. 2023), that marijuana, on its own, is no longer sufficient to create probable cause to search a vehicle in Minnesota under the automobile exception to the warrant requirement), issued in September 2023.  *See United States v. Easley*, No. 23-CR-93 (KMM/DJF), 2023 WL 6938355, at *10 (D. Minn. Oct. 20, 2023).

smell on the radio where raw marijuana was found in a Ziploc bag on the passenger seat and in a tote on the floorboard, another officer testified that he smelled marijuana when approaching the B Pillar, and a third officer testified that he smelled marijuana when the defendant opened his car door), *R. & R. adopted*, 2023 WL 7103367 (D.S.D. Oct. 27, 2023). Further, the marijuana found by Officer Walton was in the center console and included some non-hermetically sealed plastic baggies of marijuana loose in the larger plastic bag as well as some in the "Tupperware." (Dkt. 34 at 29:4-25, 30:1-8, 65:9-23.) There is no evidence to suggest that marijuana packaged in this manner would not give off an odor. In addition, based on the record, there was also marijuana residue under the driver's seat. (*Id.* at 65:11-14; *see also* Gov't Ex. 3 at 5:27-6:13 (showing what appears to be marijuana residue under the driver's seat and discovery of marijuana in center console).) Again, while Officer Walton's observation of shake after Sergeant Johnson found the firearm does not provide probable cause for Sergeant Johnson's search, but it does suggest that there was loose marijuana in the Dodge at some point before Sergeant Johnson's search. Finally, while no police officer mentioned smelling marijuana during the traffic stop or search, both Sergeant Johnson and Officer Walton mentioned smelling marijuana in their police reports. (*See* Dkt. 34 at 47:20-25 (Sergeant Johnson testifying that he mentioned smelling marijuana in his police report); *id.* at 75:1-20 (counsel asking Office Walton if his first mention of smelling marijuana was in his police report).) Their mention of smelling marijuana in their police reports bolsters their credibility. *See United States v. Harden*, No. 20-CR-201 (DWF/LIB), 2021 WL 6427705, at *8 (D. Minn. Nov. 15, 2021) ("The credibility of Deputy Cawcutt's testimony is further

bolstered by Deputy Cawcutt's inclusion of the odor in his report following the traffic stop."), *R. & R. adopted*, 2021 WL 5582281 (D. Minn. Dec. 17, 2021). In sum, the Court credits Sergeant Johnson's testimony that he smelled marijuana before he found the firearm and finds that the warrantless search of the Dodge was supported by probable cause.

The Government also argues that Sergeant Johnson's observation of a "bulge" under the driver's floormat and Fields' brushing of this "bulge" with his foot when exiting the Dodge provided probable cause for the search. In the Court's view, based on its review of the testimony and footage, that the Government somewhat overstates Sergeant Johnson's testimony regarding the "bulge" and Fields' conduct when speaking with Sergeant Johnson. (*See* Dkt. 45 at 18 (describing Fields as acting "somewhat evasively" and trying to "redirect" Sergeant Johnson).) Moreover, contrary to the Government's argument, Sergeant Johnson never testified that his previous encounters with Fields contributed to his belief that there were narcotics in the Dodge before he found the firearm. However, because the Court finds probable cause based on the odor of marijuana smelled by Sergeant Johnson, the Court does not address this argument further.

For all of these reasons, the Court recommends denial of the Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

### IV.    MOTION TO SUPPRESS STATEMENTS

Fields moves to suppress the statements he made to Detective Vesey on July 5, 2023 on the grounds that Detective Vesey "did not 'scrupulously honor' Fields' prior invocation of his *Miranda* rights" when he went to meet with Fields after he had already

invoked his right to remain silent.[7]  (Dkt. 40 at 25-26.)  The Government responds that

Fields' statements to Detective Vesey on July 5, 2024 were not the product of police

questioning, were volunteered, and consequently admissible.  (Dkt. 45 at 20.)

      As Fields acknowledges, Detective Vesey met with Fields to execute a court

warrant for his DNA (Dkt. 40 at 25), as opposed to meeting with him for the purposes of

taking a statement.  Fields points to no caselaw to support the notion that the invocation

of *Miranda* rights precludes the execution of a search warrant issued by a judge.  Further,

the Eighth Circuit has "repeatedly held that a voluntary statement made by a suspect, not

in response to interrogation, is not barred and is admissible with or without the giving of

*Miranda* warnings."  *See United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998)

(cleaned up).

      Detective Vesey testified that he did not ask Fields anything about the case, did

not initiate the conversation, did not prompt him to talk about the case, and merely

listened for about two minutes.  (Dkt. 34 at 87:15-24.)  The Court has reviewed the

footage from Detective Vesey's body worn camera, and all that Detective Vesey said and

did before Fields began his statement about the circumstances of his arrest was greet

Fields, introduce himself, and, when Fields first asked about his keys and wallet, tell

Fields to contact him using his business card to obtain his property once he was released.

(Gov't Ex. 5 at 00:30-01:10 (initial exchange between Detective Vesey and Fields); *see

also id.* at 01:10-03:30 (Fields' statement about the circumstances of his arrest).)  The

---

[7]     The only statements that remain in dispute are those made to Detective Vesey on
July 5, 2024.  (*Id.* at 1 n.1.)

Court finds that the statement made by Fields to Detective Vesey did not violate *Miranda*, because it was spontaneous and not in response to any interrogation by Detective Vesey. *See Turner*, 157 F.3d at 556.

Therefore, the Court recommends denial of Fields' Motion to Suppress Statements, Admissions, and Answers.

## V.    MOTION TO DISMISS

Fields seeks dismissal of the Indictment on the grounds that the statute he is charged under, 18 U.S.C. § 922(g)(1), is unconstitutional facially and as applied to him in violation of the Second Amendment in light of the United States Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). (Dkt. 35 at 1.) The Government opposes dismissal because the Eighth Circuit has already rejected this argument. (Dkt. 25 at 2.)

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II. The *Bruen* Court adopted the following test for determining whether a government regulation of firearms is permissible:

> [W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."
> 142 S. Ct. at 2126 (footnote omitted) (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

142 S. Ct. at 2126.

Here, Fields argues that merely having a felony record, however, was never among the reasonable, well-defined bases permitting the disarming of persons in this country's historical tradition of regulating firearms. (Dkt. 18 at 4-6.) In *United States v. Jackson*, the Eighth Circuit addressed similar arguments post-*Bruen*, finding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms," and concluding that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons." 69 F.4th 495, 505 (8th Cir. 2023). For this reason, the Eighth Circuit affirmed the denial of a motion to dismiss an indictment based on the argument that § 922(g)(1) was unconstitutional as applied to the defendant "because his drug offenses were 'non-violent' and do not show that he is more dangerous than the typical law-abiding citizen." *Id.* at 501-05. The Eighth Circuit has denied a petition for *en banc* rehearing and for panel rehearing of *Jackson*. *See United States v. Jackson*, No. 22-2870, 2023 WL 5605618, at *1 (8th Cir. Aug. 30, 2023). The Eighth Circuit has also rejected a defendant's as-applied challenge asserting entitlement to possess a firearm under the Second Amendment notwithstanding his past felony convictions because neither of his felonies qualified as "violent," finding it "foreclosed" by *Jackson*. *United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023).

The Court acknowledges, as argued by Fields, that courts outside of the Eighth Circuit have narrowed the reach of § 922(g) to exclude non-violent felons or otherwise

found § 922(g)(1) unconstitutional as applied.[8]  *See*, *e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc) (finding § 922(g)(1) unconstitutional as applied to non-violent felons); *United States v. Rahimi*, 61 F.4th 443, 460-61 (5th Cir. 2023) (finding § 922(g)(8) unconstitutional).  However, this "District Court . . . is bound . . . to apply the precedent of this Circuit."  *Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003) (citation omitted).  Both *Jackson* and *Cunningham* were decided post-*Bruen* and are dispositive of Fields' challenge to the constitutionality of § 922(g)(1).  Indeed, Fields concedes that this Court is bound by *Jackson*.  (Dkt. 18 at 1.)  For these reasons, based on current Eighth Circuit precedent, the Court recommends denial of Fields' Second Amendment-based Motion to Dismiss.

## VI.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.    Arthur Fields's Motion to Dismiss the Indictment (Dkt. 18) be **DENIED**;

2.    Arthur Fields's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 19) be **DENIED**; and

3.    Arthur Fields's Motion to Suppress Statements, Admissions, and Answers (Dkt. 20) be **DENIED**.

DATE:        April 8, 2024                *s/ Elizabeth Cowan Wright*
                                          ELIZABETH COWAN WRIGHT
                                          United States Magistrate Judge

---

[8]    Fields did not argue that all of his previous convictions were non-violent in nature.

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).